# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-

### In Re GOLD RESERVE LTD.,

*Petitioner.*

ON PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE (WILMINGTON)
IN NO. 1:17-MC-00151-LPS, HONORABLE LEONARD P. STARK

## PETITION FOR WRIT OF MANDAMUS

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200

KATHERINE G. CONNOLLY
NORTON ROSE FULBRIGHT US LLP
One Embarcadero Center, Suite 1050
San Francisco, California 94111
(628) 231-6800

TAYLOR J. LEMAY
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320

MICHAEL J. BOWE
BRITHEM LLP
565 Fifth Avenue
New York, New York 10017
(646) 653-9378

*Attorneys for Petitioner*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, Gold Reserve Ltd. states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT......................................................... i

TABLE OF AUTHORITIES.................................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................................... v

RELIEF SOUGHT ............................................................................................... 1

INTRODUCTION ............................................................................................... 1

ISSUE PRESENTED ........................................................................................... 4

STATEMENT OF FACTS..................................................................................... 4

I.      THE COURT APPOINTS THE SPECIAL MASTER TO
        OVERSEE THE SALE OF PDVH SHARES ................................................. 4

II.     PERVASIVE CONFLICTS OF INTEREST TAINT THE
        SALE PROCESS ...................................................................................... 12

III.    GOLD RESERVE'S MOTIONS TO DISQUALIFY AND STAY ............. 17

JURISDICTION AND STANDARD FOR MANDAMUS ................................... 19

REASONS FOR ISSUING THE WRIT................................................................ 20

I.      GOLD RESERVE HAS A CLEAR AND INDISPUTABLE
        RIGHT TO A STAY UNTIL GOLD RESERVE'S
        DISQUALIFICATION MOTION IS RESOLVED .................................... 20

II.     GOLD RESERVE HAS NO OTHER ADEQUATE MEANS
        OF RELIEF, AND ISSUANCE OF THE WRIT IS
        APPROPRIATE UNDER THE CIRCUMSTANCES ................................ 30

CONCLUSION ................................................................................................. 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF BAR MEMBERSHIP

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) ...............20, 21, 22, 27, 30

*Asbestos Sch. Litig.*, *In re*, 46 F.3d 1284 (3d Cir. 1994) ........................................20

*Carteret Sav. Bank, F.A. v. Shushan*, 919 F.2d 225 (3d Cir. 1990) ........................30

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) ........................................19

*Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145 (1968)..............................................................................21

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*:

    932 F.3d 126 (3d Cir. 2019) .........................................................................1

    24 F.4th 242 (3d Cir. 2022) ......................................................................1, 5

*Hahnemann Univ. Hosp. v. Edgar*, 74 F.3d 456 (3d Cir. 1996).............................30

*Howmedica Osteonics Corp.*, *In re*, 867 F.3d 390 (3d Cir. 2017) ................... 19-20

*Jenkins v. Sterlacci*, 849 F.2d 627 (D.C. Cir. 1988).................................................28

*Kensington Int'l Ltd.*, *In re*:

    353 F.3d 211 (3d Cir. 2003) .................................................2, 3, 20, 22, 23, 24

    368 F.3d 289 (3d Cir. 2004) .................................................2, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30

*Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847 (1988) ...................................21

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025), *appeal pending*, No. 25-2652 (2d Cir. Oct. 21, 2025) ...................................6

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943).............................................22

*School Asbestos Litig.*, *In re*, 977 F.2d 764 (3d Cir. 1992).....................20, 21, 22, 27

**STATUTES AND RULES**

All Writs Act, 28 U.S.C. § 1651(a)...........................................................................10

28 U.S.C. § 455 ....................................................................................................1, 23

28 U.S.C. § 455(a) ..........................................................................................2, 18, 21

28 U.S.C. § 455(a)-(b)..............................................................................................18

28 U.S.C. § 1651 .........................................................................................................1

28 U.S.C. § 1651(a) ..................................................................................................19

Del. Code Ann. tit. 8, § 324(a)...............................................................................6, 7

Fed. R. App. P. 21 ......................................................................................................1

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Petitioner requests oral argument under Federal Rule of Appellate Procedure 34(a)(1) and 3d Circuit L.A.C. 34.1(b).  Petitioner requests 15 minutes of oral argument per side.  Oral argument likely will assist the Court because this case involves both a complicated factual record and important legal issues related to standards for recusal under 28 U.S.C. § 455.

## RELIEF SOUGHT

Pursuant to 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21, Gold Reserve Ltd. ("Gold Reserve") hereby petitions for a writ of mandamus requiring the United States District Court for the District of Delaware, Stark, J., to stay further proceedings pending final resolution of Gold Reserve's motion to disqualify the district judge, the Special Master, and the Special Master's Advisors based on an appearance of, if not actual, partiality under 28 U.S.C. § 455.

## INTRODUCTION

This petition concerns a conflict of interest disclosed at the eleventh hour of a proceeding brought to satisfy certain judgments entered against the Bolivarian Republic of Venezuela through the attachment and sale of interests in the ultimate U.S. parent company of CITGO Petroleum Corp. (This Court affirmed the district court's decision to attach those assets. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 133 (3d Cir. 2019); *see also id.*, 24 F.4th 242 (3d Cir. 2022) (appeal dismissed).) In 2021, the district court (Stark, J., by designation) appointed Special Master Robert B. Pincus, Esq. (the "Special Master") to effectuate that sale. The Special Master, in turn, appointed Weil, Gotshal & Manges LLP ("Weil"), a law firm, and Evercore, Inc. ("Evercore"), an investment bank, to assist him by serving as "Advisors."

After several rounds of bidding, the Special Master has recommended a bid that is priced $2 billion *below* the highest-priced bid (which petitioner Gold Reserve submitted). If adopted, the bid that the Special Master has recommended will directly benefit both certain holders of bonds issued by Venezuela's state oil company and hedge fund Elliott Investment Management, L.P. ("Elliott"). Elliott and these bondholders have ongoing commercial relationships with the Special Master's Advisors and have paid them more than $170 million during the life of this proceeding. These are facts that Gold Reserve only recently discovered and that the Advisors artfully concealed throughout their retention in this matter. Because this conflict of interest creates an intolerable appearance of bias, Gold Reserve promptly moved to disqualify the Special Master, his Advisors, and the presiding Judge, as required under 28 U.S.C. § 455(a) and *In re Kensington International Ltd.*, 368 F.3d 289 (3d Cir. 2004) ("*Kensington II*"). And it has moved for a stay of proceedings until this disqualification motion is resolved, consistent with the writ of mandamus that this Court ordered in *In re Kensington International Ltd.*, 353 F.3d 211 (3d Cir. 2003) ("*Kensington I*"). The district court has yet to resolve the motion to disqualify and repeatedly has rejected Gold Reserve's requests for a stay.

Under these extraordinary circumstances, this Court should issue an order staying any further sale-related deadlines and determinations until Gold Reserve's

disqualification motion is finally resolved through appeal. As explained below, deposition questioning and the subsequent compelled disclosures made shortly before the evidentiary hearing on the recommended bid revealed that—contrary to prior written disclosures—the Advisors had an undisclosed relationship with, and had received $170 million in fees from, the very parties that stood to benefit from the bid they were recommending. The Special Master's recommendation thus is irredeemably tainted. And while the district court should have the opportunity to rule on the disqualification motion in the first instance, *see Kensington I*, 353 F.3d at 223-24, its refusal to stay the decision on the recommended bid until it has decided the disqualification motion threatens to extinguish Gold Reserve's right to effective consideration and review of an issue fundamental to the sale process's integrity. If the district court decides the merits first, or issues simultaneous or closely spaced decisions approving the sale and denying Gold Reserve's disqualification motion, there may be no opportunity to undo the approval of the bid and sale order: the recommended bidders will rush to close their agreement by December 1, 2025, and Gold Reserve may be denied the opportunity to challenge the disqualification ruling and secure effective relief. (A1993-94 (Tr. 253:22-254:3).)

The Court should grant the petition.

**ISSUE PRESENTED**

1.  Whether the district court must stay further consideration of the merits of the sale process until final resolution of Gold Reserve's disqualification motion.

**STATEMENT OF FACTS**

**I.  THE COURT APPOINTS THE SPECIAL MASTER TO OVERSEE THE SALE OF PDVH SHARES**

Plaintiff Crystallex International Corporation ("Crystallex") holds a $1.2 billion judgment against the Bolivarian Republic of Venezuela ("Venezuela") based on Venezuela's expropriation of its gold mining rights.  (D.I. 1.)  In the proceedings below, Crystallex sought to collect on its judgment against Venezuela by executing on property nominally owned by Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. ("PDVSA").  Specifically, Crystallex sought to attach PDVSA's shares of common stock of its wholly owned U.S. subsidiary, PDV Holding Inc. ("PDVH"), which in turn indirectly owns CITGO Petroleum Corp.  In August 2018, the district court found that PDVSA was an alter ego of Venezuela and that PDVSA's shares in PDVH were subject to attachment and execution in order to satisfy Venezuela's debt to Crystallex.  (D.I. 78, 79.)

The parties proposed various procedures to govern the sale of PDVSA's shares in PDVH to satisfy Venezuela's debt, and additional judgment creditors joined the action, including ConocoPhillips.  On January 14, 2021, the district court issued an opinion and order setting forth some of the procedures it would

follow in conducting the sale. The court also proposed, and the parties subsequently agreed, that it would appoint a special master to oversee the design and implementation of more detailed sale procedures. *See Crystallex*, 24 F.4th at 249. On April 13, 2021, the court issued an order appointing Special Master Robert B. Pincus to oversee the sale of PDVH's shares to satisfy Crystallex's judgment. By order dated May 27, 2021, the court authorized the Special Master to retain advisors to represent and assist him in the performance of his duties and granted them judicial immunity. (D.I. 277 (¶¶ 13, 21).) By letter of June 9, 2021, the Special Master informed the Court that he had retained Weil, Gotshal & Manges LLP ("Weil") as his transaction counsel and that he had determined to retain Evercore, Inc. ("Evercore") as his financial advisor. (A40.)

During this period, there also was pending litigation in the Southern District of New York involving holders of bonds issued by PDVSA in 2020. *See Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023 (S.D.N.Y.). That litigation involves the validity of the 2020 bonds under Venezuelan and New York law and a pledge of 50.1% of the equity of the immediate holding company of CITGO Petroleum, CITGO Holding. It is the position of the Venezuelan opposition government recognized by the United States that the bonds are invalid under Venezuelan law, and it is the position of the United States government that Venezuela's interpretation of its own laws is entitled to "respectful consideration."

(A991-95.)  At the time the bidding process in the Delaware case commenced in 2024, the Southern District of New York had not decided the validity of the 2020 bonds under Venezuelan law; even if the 2020 bonds are valid, their enforcement is nevertheless barred by U.S. sanctions.[1]  (A993; A966; *see also* A599-600 (discussing OFAC's suspension of General License 5).)  Accordingly, during the entire bidding process, the 2020 Bondholders were neither judgment creditors nor attached judgment creditors eligible for relief in this action under Delaware law.

The initial bidding process for the PDVH shares took place in June 2024, at which point (as today) Gold Reserve and its bidding partners submitted the highest-priced bid.  (A61.)  Under Delaware law, the district court must sell the PDVH shares to the highest bidder, *see* Del. Code Ann. tit. 8, § 324(a), but the Special Master nonetheless entered into an exclusivity agreement with a wholly owned bidding entity of Elliott, one of the world's largest restructuring and distressed asset investment firms and (as later would be revealed) a major client of both Weil and Evercore.  The Special Master then proceeded to negotiate exclusively with Elliott for several months, while other bidders were prevented

---

[1] On the last day of the September 2025 evidentiary hearing in this matter, the Southern District of New York issued a summary judgment decision holding the 2020 Bonds were enforceable under Venezuelan law.  *See Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025), *appeal pending*, No. 25-2652 (2d Cir. Oct. 21, 2025).  That decision is subject to an appeal, and the sanctions remain in place regardless.

even from accessing the data room or submitting prospective bids that otherwise would drive up the value of bids in a competitive process.

In the initial stages of bidding, after entering into its period of exclusivity, on September 27, 2024, the Special Master recommended Elliott to purchase the PDVH shares. (A43.) That recommended bid was materially lower than the Gold Reserve bid and ignored the court-approved priority for satisfying attached judgments. It also significantly favored the 2020 Bondholders over the party judgment creditors by providing for escrows of substantially all of the purchase price to potentially pay out to the 2020 Bondholders in the event their bonds and the pledge of equity in CITGO Holding were deemed valid in a final, non-appealable judgment—even though the 2020 Bondholders are not attached judgment creditors or parties to the action, and even though, at that point, the Southern District of New York's initial ruling in favor of the Bondholders had been reversed by the Second Circuit, while the enforceability of the bonds was actively being disputed and was independently barred by U.S. sanctions. (A76 & n.6.) That bid thus ignored the applicable Delaware statute under which the forced sale was being conducted, *see* Del. Code Ann. tit. 8, § 324(a), which, as noted above, requires that the assets be sold to the highest bidder for the benefit of the judgment creditors in the action.

Nearly all the parties protested the recommendation because of the uncompetitive manner in which it was negotiated and its unduly favorable terms for Elliott and the 2020 Bondholders. (A69-72; A77.) In the face of this staunch creditor opposition, the Special Master ultimately abandoned this recommendation. (A618 (¶ 4).) Thereafter, the district court ordered the Special Master and potential bidders to conduct a new sale process with new Bidder Protections designed, in part, to avoid a similar failed process. (A144-51; A170-77; A625-26 (¶¶ 33-35).)[2]

Under those reformed procedures, the Special Master again selected as the designated "Stalking Horse" bid—that is, a baseline bid intended to set the floor for subsequent bids—a bid lower than Gold Reserve's submitted by a different judgment creditor (Red Tree Investments, LLC) that also was one of the major 2020 Bondholders and ███████████████████████. (A593; A2272 n.1; A2276 (████████████).) This lower bid again provided for payment of the 2020 Bondholders to the detriment of the judgment creditors in the action. (A596-97.)

---

[2] These Bidder Protections included, among other things: a No-Shop/Non-Solicitation Period following a final recommendation; a Subsequent Overbid Minimum requiring an unsolicited bid to exceed the recommended purchase price by at least $80 million; limitations on the Special Master's discretion to lower the Overbid Minimum; and Evaluation Criteria clarifying that there was no requirement with respect to the 2020 Bondholders other than the bidder's acknowledgement that the Bondholders have a pledge on CITGO Holding equity and are engaged in active litigation regarding their interests.

The Stalking Horse selection was followed by a "Topping Period" designed to induce competitive bidding against the Stalking Horse bid. (A629 (¶ 49).) In that period, Gold Reserve submitted a higher bid than its previous high bid. (A631-32 (¶¶ 54, 58).) At the close of the period, the Special Master recommended Gold Reserve's $7.382 billion bid as the "best bid" and entered into a stock purchase agreement ("SPA") with Gold Reserve's bidding entity, Dalinar Energy. (A616-17; A643-44 (¶¶ 75-76, 78); A673-770.)

Meanwhile, however, during the same Topping Period, Weil also communicated with Elliott about Elliott's desire to submit a topping bid and its difficulty in preparing one in time. Rather than encourage Elliott to submit its best topping bid as the bidding procedures were designed to ensure, Weil strategized with Elliott that it would be better for Elliott to submit an "unsolicited" bid after the Final Recommendation was made, after Elliott had the benefit of seeing the recommended bid. (A2428.) Among other things, they discussed how this would save Elliott "some money in commitment fees." (*Id.*) (Gold Reserve, by contrast, was locking itself in to the same commitment fees as part of being named the Final Recommended bid and executing the SPA and its financing letters.) These conversations with Weil occurred after a senior person at Elliott reached out to the client-relationship partner at Weil, who also was the leader of the Weil restructuring group, requesting "help." In response to Elliott's request, that senior

Weil leader reached out to the team advising the Special Master and informed them that he would "hate for [Elliott] to not want to work with us." (A2328; A2513-14.)

Consistent with the discussions between Elliott and Weil, in early August 2025, just days before the sale hearing to confirm the Gold Reserve bid, Elliott submitted a purported unsolicited bid that was approximately $1.5 billion lower than the Gold Reserve bid but again contained terms that would ensure payment of more than $2.1 billion to the non-judgment creditor 2020 Bondholders, to the significant detriment of the party judgment creditors. (A801-05 (¶¶ 4, 7, 9).) This materially lower bid, which, like earlier bids, favored the 2020 Bondholders over the actual party judgment creditors, not only contravened the Delaware statute but also failed to meet the requirements of the bidding protections for an unsolicited bid set forth in the district court's orders and Gold Reserve's SPA. (*See* A155-56; A174-77 (Non-Solicitation Period and Overbid Minimum terms); A733-35 (§ 6.16).) Nevertheless, on August 25, the Special Master designated Elliott's bid as a Superior Proposal. (A797-99.)

The singular feature cited by the Special Master as favoring the Elliott bid was its agreement to pay off the 2020 Bondholders for their still-contingent claims. (A798.) As the Special Master subsequently explained in his Updated Final Recommendation, the "[m]ost significant[ ]" aspect of the Elliott proposal was supposedly that it "virtually eliminates any closing risks associated with" separate

bondholder litigation pending in the Southern District of New York "by delivering a settlement with the PDVSA 2020 Bondholders," such that the transaction "can close regardless of the outcome of the 2020 Bondholders litigation, and it secures an approximately $895 million discount on the PDVSA 2020 Bondholders' claims." (A809 (¶ 16).)[3] Despite the purported significance of the settlement of Elliott's bid, Evercore's lead representative later admitted at his deposition that he had not even read Elliott's Transaction Support Agreement with the 2020 Bondholders—the document embodying the settlement. (A1174.)

Because Elliott's bid came in after the Topping Period, the terms of the SPA provided that Gold Reserve had just three days following the Notice of Superior Proposal to improve its own proposal in response. (A798.) Although this materially limited its ability to improve its bid, with enormous effort, Gold Reserve submitted a new bid priced at $7.902 billion, which is more than $2 billion higher than Elliott's bid and which would satisfy more judgments than any conforming bid submitted in this process. (A802 (¶ 5), A807-09 (¶¶ 13-15).) To no avail. The next day, the Special Master filed his Updated Final Recommendation requesting to terminate Gold Reserve's existing SPA and recommending Elliott's underbid. (A800-16.) That Updated Final Recommendation is before the district court today.

---

[3] Notably, this supposedly decisive aspect of the Elliott bid was not a requirement under the reformed Evaluation Criteria introduced as part of the Bidder Protections when the sale process was restarted.

## II.    PERVASIVE CONFLICTS OF INTEREST TAINT THE SALE PROCESS

As noted above, the Special Master retained Weil and Evercore as Advisors shortly after his appointment in April 2021, and they have managed the sale process for him ever since.  (A40.)  In fact, throughout the sale process, the Advisors have been in control.  Over just the past 14 months, when the Special Master took all the dubious actions discussed herein, the Special Master himself has claimed a total of just over $700,000 ($713,191.83) in fees and expenses. (A66; A82; A131; A216; A605; A611; A788; A1089.)  That amount is less than one average month's bill from Weil and Evercore, which collectively have claimed more than $39 million ($39,335,923.14) in fees and expenses over the same period. (*Id.*)

Meanwhile, the district court largely deferred to the Special Master and his Advisors, explaining at a recent *ex parte* conference with the Special Master's team that the court had been "dealing with other things," had "no insight into what [the Special Master is] doing day-to-day, and what the status of the bids are," and "should just remain, curious, but not have you fill me in on anything."  (A780-81 (Tr. 19:7-20:8).)  Indeed, the Advisors repeatedly have led the Special Master's private, *ex parte* meetings with the district court, at which the Advisors pushed back against the court's skepticism concerning the Special Master's preference for the lower-priced bid.  (*See* D.I. 1840-1 at 60:14-18 (Stark, J.) ("Again, I don't

know exactly what the 2020 creditors' settlement is worth, but offhand I'm thinking, you know, the $1 billion sounds like it might be better.").)  At these *ex parte* conferences, the Advisors have sought advice from the district court on the form of the evidentiary record that would be required to justify their recommendations.  (*See id.* at 64:21-65:3 ("[D]o you also think you will need from us some type of an evidentiary submission from, say, for example, Evercore, laying out what the process was that led us to this spot?").)  Furthermore, the Advisors have not merely been the main forces in evaluating competing bids, but they have shaped the entire bidding process and its priorities through countless conversations with the participants where they communicated guidance and priorities on a one-on-one non-uniform basis.

At the time of the Advisors' appointment and for the vast majority of the sale process, Gold Reserve and other judgment creditors have had no reason to suspect that Weil's and Evercore's relationships with Elliott and the 2020 Bondholders were more than de minimis.  On the contrary, the Special Master, Weil, and Evercore have withheld these ongoing relationships in prior disclosures. For instance, in response to a standard discovery request that the Special Master produce "[d]ocuments sufficient to identify any professional engagements in which You or Your advisors performed work for any bidder participating in the sale process" (A587), Weil disclosed only one, purportedly concluded, 27-day

engagement with Elliott from July 17, 2024 to August 13, 2024 (A2263). Evercore did not disclose any engagements with Elliott. (A2264.)

That response was highly misleading. Not until the Advisors had been in place for years—and after Elliott's unsolicited bid had been selected as the updated recommended bid—would the parties and the district court learn that both Weil and Evercore have ongoing, material professional relationships with both Elliott and the 2020 Bondholders. Indeed, only after Elliott's bid was submitted, at the deposition of Elliott's assistant general counsel, did Gold Reserve learn that Weil has served and continues to serve as Elliott's outside counsel in various matters, including in the United Kingdom and in connection with trading, credit, and restructuring issues. (A2252-53.) This attorney-client relationship has persisted for at least the past two-and-a-half years. (A2251, A2254.) Disclosures revealed that, in the first two years after its appointment as an Advisor to the Special Master, Weil had earned no fees from Elliott, but, since then, Elliott has paid fees that have increased every year, starting in 2023, when the sale process kicked off with initial marketing of the PDVH shares to potential purchasers. (A1141.) Evercore, meanwhile, has acted as investment banker for Elliott "in ad hoc groups" during the same period, including a recent engagement where Elliott facilitated Evercore's selection and Evercore stands to receive ███████ in fees. (A2255-61.)

After Gold Reserve promptly raised these conflicts of interest with the district court last month, the court ordered a response from the Special Master and his Advisors.  (*See* A2269.)  Their subsequent disclosures have revealed that Weil has collected more than $4.6 million in fees from Elliott and its affiliates from 2023-2025, spanning 16 different matters.  (A1141; A2266-67.)  Weil also has multiple recent matters (some of them active) for Elliott where Weil has yet to be paid and on which additional unspecified fees are forthcoming.  (A2272-73; A2279.)

More significantly, disclosure to date reveals that, since the Special Master retained Weil in 2021, Weil has earned more than $62 million in fees from the 2020 Bondholders whose interests the Advisors have made a priority from the outset of the bidding process that began in 2024.  (A1163.)  Weil also has earned $12.8 million more from ad hoc groups that include one or more of the 2020 Bondholders.  (A1163 & n.1.)

For its part, Evercore has earned ██████████████████ in fees from ad hoc groups involving Elliott and will obtain ██████ more for its collaborations with Elliott on other matters.  (A2259-61; A2276 n.2; A2485-86.)  In mid-July 2025, Evercore was pitching another ad hoc group of creditors, among whom Elliott was ██████████████████ (A2285.)  Evercore personnel acknowledged internally that their ongoing relationship with Elliott have posed

a "huge issue"—i.e., a conflict of interest—for securing the work from the ad hoc groups comprised of various creditor interests.  (A2283; *see also* A2286.)  Although Evercore understood their relationship with Elliott would be viewed as a conflict by that group, they ignored the same conflict in continuing to advise the Special Master to recommend Elliott's significant underbid in this matter just weeks later.  (A800-16.)  During the period in which it has been an Advisor to the Special Master, Evercore has earned more than $80 million directly or through ad hoc groups involving these 2020 Bondholders whose interests the Advisors have prioritized in this proceeding.  (A2485-87.)

The relationship between the Advisors and the 2020 Bondholders is especially damning in light of the Special Master's reliance on the settlement between Elliott and the 2020 Bondholders as the "[m]ost significant[ ]" reason for recommending Elliott's bid.  (*Supra* pp. 10-11.)  In supporting its bid, Gold Reserve provided a 29-page detailed analysis demonstrating that the 2020 Bondholders pose no risk to the closing of Gold Reserve's bid.  In an *ex parte* communication with the district court, however, Weil dismissed and criticized this detailed analysis without providing or even having conducted its own reasoned risk analysis.  (D.I. 1840-1 at 51:19-52:13.) (describing a Gold Reserve legal memorandum as having "limited value" and "not much legal analysis in it," and being "mostly conclusory and frankly, arbitrary").

Even though they thereafter recommended the Elliott bid on the basis of this very risk, the Advisors never calculated the impact of that risk on the value of Gold Reserve's bid. (A805 (¶ 9).) In sum, the Special Master recommended a bid that delivers $2 billion *less* to judgment creditors in order to deliver $2 billion to the 2020 Bondholders—parties represented by the very Advisors who shaped and recommended the bid.

## III. GOLD RESERVE'S MOTIONS TO DISQUALIFY AND STAY

On September 10, 2025, the day after Gold Reserve learned of the Advisors' conflicts through Elliott's deposition testimony, Gold Reserve notified the district court of the conflict and requested that the Advisors fully disclose the fees paid from interested parties. (A2181-82.) In response, Weil again attempted to misdirect by representing to the court that the amount of such fees was "not going to be material." (A1119.) After the Advisors made their initial disclosures showing millions of dollars of fees earned from Elliott, on September 13, 2025, Gold Reserve moved the court to stay the sale hearing set to commence on September 15 pending fuller discovery. (D.I. 2306-1.) The court denied Gold Reserve's stay request later that day and ordered the Special Master to respond to Gold Reserve's September 13 letter motion. (D.I. 2289.) On September 15, 2025, at the first day of the sale hearing, Gold Reserve again raised the Advisors' conflicts, and Venezuela and its affiliates (the "Venezuela Parties") formally moved the court

to stay the proceedings and disqualify the Special Master and his Advisors.[4]  The court again denied the stay request, and, on September 29, set a briefing schedule with respect to Gold Reserve's and the Venezuela Parties' motions to disqualify, with all briefing to be concluded by October 19.  (D.I. 2347.)

On October 9, 2025, Gold Reserve filed its motion to disqualify the district judge, the Special Master, and the Special Master's Advisors under 28 U.S.C. § 455(a)-(b).  (A2224-49.)  (The Venezuela Parties renewed their more limited motion.  (A2288-315.))  The Special Master (through Weil), Elliott, and creditors Crystallex and ConocoPhillips filed oppositions.  (A2500-24; A2551-76; A2577-608.)  Gold Reserve's October 9 motion also sought a stay of all further merits proceedings until the disqualification issues were resolved.  (A2245-46.)  As Gold Reserve explained, disqualification is a threshold issue that must be decided before the merits because, in any case where a judge's "impartiality might reasonably be questioned," the judge *shall* disqualify himself," 28 U.S.C. § 455(a) (emphasis added)—the judge has no statutory authority to decide the case.  (A2245.)

On October 20, 2025, Judge Stark heard argument on the disqualification motions.  Although Judge Stark took Gold Reserve's disqualification motion under

---

[4] The Venezuela Parties have previously moved to disqualify the Special Master and his Advisors on grounds unrelated to those at issue in Gold Reserve's now-pending motion.  (D.I. 385, 509, 1138).  The district court denied those motions (D.I. 443, 544, 1180).

advisement, he again denied its stay request, held that closing arguments on the Final Recommendation would proceed the next day, and said he would "make a decision at some point as to in what order I will decide things." (A1739.)

At the end of the October 21 closing arguments, Gold Reserve again renewed its motion to stay, noting the prejudice Gold Reserve would suffer if the district court approved Elliott's bid without giving Gold Reserve the opportunity to appeal an unfavorable disqualification decision. (A2165-67.) Again, Judge Stark denied the motion, said he would wait until at least October 28 to rule on the Recommendation, and said "[i]t's possible" he would clarify "when to expect rulings." (A2167-68.) On October 23, Gold Reserve filed a letter reiterating its request for clarity on the timing of Judge Stark's decisions. (A2179.) Judge Stark has not acted upon that renewed request.

## JURISDICTION AND STANDARD FOR MANDAMUS

This Court has jurisdiction to issue Writs of Mandamus under the All Writs Act, which provides that this Court "may issue all writs necessary or appropriate in aid of" its jurisdiction. 28 U.S.C. § 1651(a). Mandamus relief is warranted when (1) the "right to issuance of the writ is clear and indisputable"; (2) the petitioner has "no other adequate means" of obtaining relief; and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004) (cleaned up); *see In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d

Cir. 2017). "Mandamus may be especially appropriate to further supervisory and instructional goals." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1288 (3d Cir. 1994) (Alito, J.). And "'[v]irtually every court of appeals has recognized the necessity and propriety of interlocutory review of disqualification issues on petitions for mandamus "to ensure that judges do not adjudicate cases that they have no statutory power to hear."'" *Kensington I*, 353 F.3d at 219-20 (quoting *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 (3d Cir. 1993), quoting in turn *In re School Asbestos Litig.*, 977 F.2d 764, 778 (3d Cir. 1992)) (brackets in *Kensington I*).

## REASONS FOR ISSUING THE WRIT

### I. GOLD RESERVE HAS A CLEAR AND INDISPUTABLE RIGHT TO A STAY UNTIL GOLD RESERVE'S DISQUALIFICATION MOTION IS RESOLVED

Given the evidence of the Advisors' conflicts of interest, under *Kensington I* and *Kensington II*, Gold Reserve has a clear and unambiguous right to an order staying all proceedings until final resolution of the pending disqualification motion. A writ of mandamus is required here because (a) disqualification is a threshold question implicating the tribunal's power to adjudicate a case, (b) the facts uncovered here about the Special Master and his Advisors' conflicts of interest are ones that this Court's precedent shows are disqualifying, and (c) none of the arguments the Special Master or his Advisors have made against disqualification justifies ignoring the appearance of partiality.

**A.**     Disqualification is required whenever a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Disqualification "concerns not only fairness to individual litigants, but, equally important, it concerns 'the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.'" *Alexander*, 10 F.3d at 162 (quoting *School Asbestos*, 977 F.2d at 776). Accordingly, "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 150 (1968).

As this Court has made clear, the appearance of bias alone is sufficient to require disqualification under Section 455(a) even absent evidence of actual bias. *See Alexander*, 10 F.3d at 162; *Kensington II*, 368 F.3d at 317-18. Whenever circumstances create an appearance of bias under this standard, disqualification is mandatory. *See* 28 U.S.C. § 455(a); *Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 859-61 (1988). In such circumstances, a court has "no statutory power to hear" the case. *School Asbestos*, 977 F.2d at 778.

The "need for a writ of mandamus is . . . clear and indisputable" when circumstances point to the need for disqualification because the "decision not to recuse . . . is, in effect, no different than an appeal from a district court's order denying recusal." *Kensington II*, 368 F.3d at 301. Similarly, here, the district

court's refusal to stay the merits of the Special Master's recommendation while Gold Reserve's disqualification motion remains unresolved is tantamount to denying the disqualification motion. *Kensington I* reasoned that disqualification is a threshold issue because a court with the appearance of bias lacks any power over the case. For that reason, "[v]irtually every court of appeals has recognized the necessity and propriety of interlocutory review of disqualification issues on petitions for mandamus 'to ensure that judges do not adjudicate cases that they have no statutory power to hear.'" *Alexander*, 10 F.3d at 163 (quoting *School Asbestos*, 977 F.2d at 778 (citing cases)). The need for complete resolution and interlocutory review of disqualification issues requires that merits-related issues not proceed until such review is complete. "[S]ection 455 reflects Congress's view that the adjudication of a case by a judge with an actual *or* apparent bias is an 'abuse of judicial power' . . . [and] a threat to the integrity of the judicial system." *School Asbestos*, 977 F.2d at 778 (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 31 (1943)).

As *Kensington I* makes clear, the district court must resolve those questions regarding its own adjudicatory authority—on a full evidentiary record and subject to interlocutory review—before proceeding further with the merits of the case. This Court should order the district court to stay merits proceedings while the disqualification motion remains pending before it or on appeal.

**B.** Gold Reserve's disqualification motion arises out of conflicts of interest that are at least as serious as those this Court confirmed are disqualifying in *Kensington*. Where, as here, an adjudicator consults with advisors who themselves have conflicts of interest, the advisors' apparent bias imputes to and mandates disqualification of the adjudicator himself. *See Kensington II*, 368 F.3d at 306-09. Here, Weil's attorney-client relationship with Elliott and the 2020 Bondholders, and Evercore's commercial relationship with Elliott and the 2020 Bondholders, create material conflicts of interest that are incompatible with the impartiality obligations of Section 455, and those conflicts impute to the Special Master and the district court.

At a minimum, Gold Reserve has raised substantial disqualification arguments that, under *Kensington I*, must be finally resolved before further proceedings on the merits. In *Kensington I*, petitioners had filed motions in the bankruptcy court seeking recusal of the district judge, pointing to conflicts of interest of certain court-appointed "Consultants" with whom the district judge had had regular *ex parte* communications. 353 F.3d at 216. The district judge withdrew the motions from the bankruptcy court and stayed discovery on them. *Id.* at 214. The petitioners sought an order directing the district judge to expedite consideration of the recusal motions and to grant the withheld discovery. *Id.* This Court granted the petition, directing the district court to rule on the recusal motions within six

weeks of its decision while staying all related merits proceedings and retaining jurisdiction of the case in the event further proceedings were required thereafter. *Id.* at 214, 224-25. And after the district court refused to recuse, in *Kensington II*, this Court held that the district judge's attorney advisors in that asbestos case were conflicted because they also represented plaintiffs in an "unrelated asbestos-driven bankruptcy," where they "espoused views therein on the same disputed issues." 368 F.3d at 302. This Court held that those circumstances "require[d] disqualification." *Id.* at 318. Between *Kensington I* and *Kensington II*—a period of five months—this Court's stay of the district court's proceedings remained in place.

The facts of this case parallel those of *Kensington II*. Weil and Evercore represent parties with a direct financial interest in *this* proceeding: Elliott, whose bid the Special Master has recommended, and the 2020 Bondholders would be the material beneficiaries of that bid.

If anything, the facts warranting disqualification in this case are worse than in *Kensington II*. There, this Court emphasized "the importance of the Advisors' role" and their "unique level of influence" over the district judge, which, given the advisors' conflict, created an impermissible appearance of bias. *Id.* at 304. Disqualification was required even though the judge had "met with the Advisors as a group on only four occasions for a total of eighteen hours," after which they

"became functionally obsolete." *Id*. at 306. Here, Weil and Evercore have dominated the sale process from the beginning, effectively serving as the Special Master themselves, and incurring thousands of hours in billings in so doing. (*Supra* p. 12.) And in *Kensington II*, the advisors' conflict required the district judge's disqualification even though the advisors' participation in the bankruptcy case could have been discovered from that case's public docket. *See* 368 F.3d at 312-13. Here, Weil and Evercore actively concealed their conflict until one of their designated witnesses revealed it in a deposition just a week before the sale hearing, and they have continued to try to downplay the conflict ever since. (*Supra* pp. 3, 14.) Given the truncated time that the district court provided for discovery on that conflict before proceeding with the sale hearing, the Advisors still have not revealed the true extent of their engagements with Elliott, its various affiliates, and the 2020 Bondholders.

"[W]here, as here, [an adjudicator] surrounds himself with individuals who may not be truly disinterested," "there is an almost irrebuttable presumption that a judge is 'tainted' and must be disqualified." *Kensington II*, 368 F.3d at 308. Weil and Evercore cannot provide impartial advice to the court—much less evaluate competing bids in a disinterested manner—when they simultaneously have highly lucrative relationships with parties that have direct interests in these proceedings.

Moreover, the Advisors' inadequate disclosures and affirmative misrepresentations about these conflicts only intensifies the perceived bias.

To make matters even worse, the evidence shows that the Advisors' conflicts of interest have "actually affected the [Special Master's] decision[s]" here. *Id.* at 307. As detailed above, the Special Master, guided by his Advisors, (i) first agreed to negotiate exclusively with Elliott while shielding Elliott from price competition for its initial underbid, which the Special Master made the subject of his first final recommendation, but which was so defective that the district court ordered the bidding to be redone; (ii) then unilaterally and impermissibly eliminated court-ordered Bidder Protections so that he could entertain a bid from Elliott that was $1.5 billion (now $2 billion) lower than the Gold Reserve bid he had recommended; and (iii) ultimately recommended Elliott's lower-priced bid because it purportedly had a higher certainty of closing in light of the 2020 Bondholders litigation, with no meaningful analysis of the risk that the Bondholders' claims might succeed.

In so doing, the Advisors have recommended approval of an arrangement that delivers more than $2 billion to their 2020 Bondholder-clients at the expense of the judgment creditors in this judgment enforcement proceeding. This course of conduct has, with the benefit of the newly discovered evidence, destroyed the appearance of impartiality and fairness in this proceeding. *See Kensington II*,

368 F.3d at 309-12; *School Asbestos*, 977 F.2d at 781-82 (judge's attendance at informational conference where plaintiffs' experts presented on merits-related issues warranted disqualification); *Alexander*, 10 F.3d at 164-66 (judge's criticism of plaintiffs and their witnesses created disqualifying appearance of bias).

      **C.**     None of the Special Master's or his Advisors' arguments against disqualification provides any reason to doubt that the conflicts of interest present here, at minimum, undermine the appearance of impartiality. *First*, the Special Master and his Advisors have argued that recusal would make it "impossible for any law firm or investment bank with the requisite experience and expertise to serve as the Special Master's advisors" (A2566), but that is incorrect. This Court rejected a similar argument in *Kensington II*, reasoning that, although "asbestos bankruptcies are complicated," the advisors' conflicts of interest are not "too complex for the average person to comprehend" but instead are "fairly straightforward": the district court was "tainted by the involvement of two court-appointed advisors who, at the same time that they were supposed to be giving neutral advice . . . , represented . . . claimants . . . on the same disputed issues." 368 F.3d at 302. That reasoning makes sense here. The conflict is clear, and it cannot be the case that the Advisors' client base is both immaterial but also essential to the business of every advisor in this space. Moreover, if this matter would have prejudiced the Advisors' ability to service these important clients, the

Advisors should have turned down this engagement. And the undisputed evidence shows that Weil in fact did not represent Elliott during the first two years of it serving as counsel to the Special Master—thus directly contradicting its present assertion that only conflicted advisors are available. It cannot be true that only conflicted advisors have the necessary expertise to manage this sale process.

*Second*, the Special Master and the Advisors argue that tens of millions in fees the Advisors received from clients bidding in and benefitting from the process the Advisors were running are not disqualifying because the fees were "a miniscule fraction" of the Advisors' total revenue. (A2594.) But when accepting appointment as Advisors in these judicial proceedings, Weil and Evercore "had a duty to remain neutral . . . and to provide objective, unbiased information to" the district court. *Kensington II*, 368 F.3d at 303. Indeed, "it is sufficient, and necessary, that an individual who accepts an appointment as a special master scrupulously avoid any undertaking, as an advocate or otherwise, that would tend or appear to compromise his impartiality as a decisionmaker." *Jenkins v. Sterlacci*, 849 F.2d 627, 632 (D.C. Cir. 1988).

*Third*, there is no merit to the Advisors' argument that Gold Reserve's disqualification motion is untimely. It was only at the September 9, 2025 deposition of Elliott's assistant general counsel that Gold Reserve learned for the first time that both Weil and Evercore have years-long relationships with Elliott

that have continued concurrently with their purportedly impartial role in this sale process.  (A2230, A2251-61.)  The very next day, Gold Reserve notified the district court of these conflicts and requested that the Advisors fully disclose the fees paid from all interested parties.  (A2181-82.)  In response, Weil again attempted to misdirect by representing to the district court that the amount of such fees was "not going to be material."  (A1119.)  Ultimately, these disclosures revealed for the first time $170 million in fees paid to the Advisors.  (A1141; A1163; A2485-87.)  There can be no claim of waiver on these facts.

Moreover, any waiver argument runs headlong into *Kensington II*.  In *Kensington II*, Judge Wolin's advisors' concurrent representation of claimants in an "unrelated asbestos-driven bankruptcy" was "a matter of public record"; it was disclosed in public "trade periodicals"; and it was known by "many of the attorneys involved" in the matter.  368 F.3d at 302, 313.  And the advisors' participation in the separate matter was not only public knowledge for almost two years before petitioners moved for disqualification but also known at the time of the advisors' appointment by Judge Wolin.  *Id.* at 297, 299.  Nevertheless, this Court made clear that "nothing short of actual knowledge of the facts giving rise to the recusal motions and the Petitions for Mandamus would satisfy the § 455(a) timeliness factor here."  *Id.* at 314.  That is because "plac[ing] the burden on the Petitioners to uncover" the conflict "does not further the purpose of § 455(a),

which mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." *Id.* at 313 (cleaned up).

## II. GOLD RESERVE HAS NO OTHER ADEQUATE MEANS OF RELIEF, AND ISSUANCE OF THE WRIT IS APPROPRIATE UNDER THE CIRCUMSTANCES

The requested writ is the only adequate means by which Gold Reserve can secure a stay of merits proceedings. *See*, *e.g.*, *Carteret Sav. Bank, F.A. v. Shushan*, 919 F.2d 225, 233 (3d Cir. 1990) (issuing writ regarding erroneous transfer order and explaining that "mandamus is appropriate for if it is not issued there is no other adequate means to avoid the transfer"). Gold Reserve moved the district court on October 9 to stay the proceedings below pending the resolution of its disqualification motion. At the October 20 hearing, Judge Stark denied the motion to stay, and he has declined to clarify whether he will decide the disqualification issues before deciding whether to adopt the Final Recommendation. (*See* A1739 (explaining that the court would "make a decision at some point as to in what order I will decide things").)

Mandamus is needed because, if Judge Stark adopts the Recommendation, Gold Reserve's right to appellate review regarding disqualification may be destroyed. *See Hahnemann Univ. Hosp. v. Edgar*, 74 F.3d 456, 462 (3d Cir. 1996) (writ appropriate where right "could be lost forever unless we issue a writ of mandamus"); *accord Alexander*, 10 F.3d at 163 (granting mandamus where the

litigation concerned "the availability of medical benefits and life insurance proceeds for the petitioners, who are aged retirees and their spouses"). Elliott is poised to close its agreement on December 1, 2025. If Judge Stark denies Gold Reserve's disqualification motion at the same time (or about the same time) as he approves the recommendation, absent relief from this Court, Gold Reserve may have no practicable opportunity to challenge that denial before the transaction closes—at which point the proverbial bell will be difficult or impossible to un-ring.

Further, Gold Reserve has obtained only limited discovery in support of its disqualification motion to date. While Gold Reserve promptly sought full disclosures regarding the relationships between Weil and Evercore and Elliott and the 2020 Bondholders, the district court's expedited disqualification briefing schedule has heretofore deprived Gold Reserve of full discovery into the nature of these disqualifying conflicts. Among several other still-unsatisfied discovery requests, Gold Reserve has received few internal communications and no text messages, and Gold Reserve has not yet taken depositions on the conflicts issues, where Weil's and Evercore's efforts to minimize those relationships can be tested. (*See* A1070; A2215.) Resolving Gold Reserve's disqualification motion on this limited evidentiary record would allow Elliott's bid to move forward without adequate examination of the conflicts that infect the sale process. Mandamus relief is needed to forestall that result.

## CONCLUSION

The Court should order the district court to stay further consideration of the merits until final resolution of Gold Reserve's disqualification motion and retain jurisdiction in case further proceedings before this Court are necessary.

Respectfully submitted,

/s/ *Aaron M. Panner*

| | |
|---|---|
| MATTHEW H. KIRTLAND | AARON M. PANNER |
| NORTON ROSE FULBRIGHT US LLP | DANIEL S. SEVERSON |
| 799 Ninth Street NW, Suite 1000 | COLLIN R. WHITE |
| Washington, DC 20001 | DENNIS D. HOWE |
| (202) 662-0200 | KELLOGG, HANSEN, TODD, |
| matthew.kirtland@ | FIGEL & FREDERICK, P.L.L.C. |
| nortonrosefulbright.com | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| KATHERINE G. CONNOLLY | (202) 326-7921 |
| NORTON ROSE FULBRIGHT US LLP | apanner@kellogghansen.com |
| One Embarcadero Center, Suite 1050 | dseverson@kellogghansen.com |
| San Francisco, California 94111 | cwhite@kellogghansen.com |
| (628) 231-6800 | dhowe@kellogghansen.com |
| katie.connolly@ | |
| nortonrosefulbright.com | KEVIN J. MANGAN |
| | MATTHEW P. WARD |
| TAYLOR J. LEMAY | STEPHANIE SMIERTKA RILEY |
| NORTON ROSE FULBRIGHT US LLP | WOMBLE BOND DICKINSON (US) LLP |
| 1550 Lamar Street, Suite 2000 | 1313 North Market Street, Suite 1200 |
| Houston, Texas 77010 | Wilmington, Delaware 19801 |
| (713) 651-5151 | (302) 252-4320 |
| taylor.lemay@ | kevin.mangan@wbd-us.com |
| nortonrosefulbright.com | matthew.ward@wbd-us.com |
| | stephanie.riley@wbd-us.com |
| | |
| | MICHAEL BOWE |
| | TYLER PURINTON |
| | BRITHEM LLP |
| | 565 Fifth Avenue |
| | New York, NY 10017 |
| | (646) 653-9173 |
| | mbowe@brithem.com |
| | purinton@brithem.com |

*Counsel for Petitioner Gold Reserve Ltd.*

October 28, 2025

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(l) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 7,364 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3.     In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CrowdStrike) has been run on the electronic file, and that no virus was detected.

Dated:  October 28, 2025

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Petitioner*
*Gold Reserve Ltd.*

## CERTIFICATE OF FILING AND SERVICE

I certify that, on October 28, 2025, the foregoing was filed electronically with the Clerk of Court.

I further certify that, on October 28, 2025, true and correct copies of the foregoing Petition for Writ of Mandamus, as well as the Appendix filed herewith, are being sent via FedEx and, where applicable, electronic mail to the following counsel of record and the trial court judge:

### BY FEDEX

Randall C. Lohan
Clerk, United States District Court
  for the District of Delaware
844 North King Street, Unit 18
Wilmington, Delaware 19801-3570
(302) 573-6170
(On behalf of Hon. Leonard P. Stark)

Hon. Leonard P. Stark
United States Court of Appeals
  for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

### BY FEDEX AND EMAIL

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
Brian McCarty
Karsten Ball
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
mestrada@gibsondunn.com
ltownsend@gibsondunn.com
asmith@gibsondunn.com
bmccarty@gibsondunn.com
kball@gibsondunn.com
*Attorneys for Crystallex*
*International Corporation*

George Garvey
Raphael Sepulveda
Adeel Mohammadi
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-3426
george.garvey@mto.com
raphael.sepulveda@mto.com
adeel.mohammadi@mto.com
*Attorneys for Defendant*
*Bolivarian Republic of Venezuela*

Matthew S. Barr
David J. Lender
Jared R. Friedmann
Chase A. Bentley
Aaron Curtis
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
matt.barr@weil.com
david.lender@weil.com
jared.friedmann@weil.com
chase.bentley@weil.com
aaron.curtis@weil.com
*Attorneys for Special Master*
*Robert B. Pincus*

Jason C. Rubinstein
Geoffrey Cajigas
FRIEDMAN KAPLAN SEILER
   ADELMAN & ROBBINS LLP
7 Times Square
New York, New York 10036
(212) 833-1100
jrubinstein@fklaw.com
gcajigas@fklaw.com
*Attorneys for Evercore Group, L.L.C.*

Stephen M. Elliott
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL
   PROGRAMS BRANCH
1100 L Street, N.W.
Suite 11020
Washington, D.C. 20530
(202) 353-0889
stephen.m.elliott@usdoj.gov
*Attorney for the United States*

Marie M. Degnan
Randall J. Teti
Frederick Troupe Mickler, IV
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
(302) 654-1888
mdegnan@ashbygeddes.com
rteti@ashbygeddes.com
tmickler@ashbygeddes.com
*Attorneys for ACL1 Investments Ltd.,*
*ACL2 Investments Ltd., and*
*LDO (Cayman) XVIII Ltd.*

Stephen B. Brauerman
BAYARD, P.A.
600 N. King Street, Suite 400
P.O. Box 25130
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com

David W. Bowker
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington D.C. 20037
(202) 663-6000
david.bowker@wilmerhale.com
*Attorneys for Altana Credit*
*Opportunities Fund SPC, Altana*
*Credit Opportunities Fund 1 SP,*
*and Altana Funds Ltd. Cayman*

Shannon Doughty
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
shannondoughty@quinnemanuel.com
*Attorney for Amber Energy Inc.*

Thomas A. Uebler
Terisa A. Shoremount
MCCOLLOM D'EMILIO SMITH
    UEBLER LLC
Little Falls Centre II
2751 Centerville Road, Suite 401
Wilmington, Delaware 19808
(302) 468-5960
tuebler@mdsulaw.com
tshoremount@mdsulaw.com
*Attorneys for Banco San Juan
Internacional, Inc.*

Daniel Alan Mason
Sabrina M. Hendershot
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1313 North Market Street
Suite 806
P.O. Box 32
Wilmington, Delaware 19801
(302) 655-4410
dmason@paulweiss.com
shendershot@paulweiss.com
*Attorneys for Blackrock Financial
Management, Inc. and Contrarian
Capital Management, L.L.C.*

Andrew Hall Sauder
DAILEY LLP
1201 N. Orange Street, Suite 7300
Wilmington, Delaware 19801
asauder@daileyllp.com
(302) 415-3560
*Attorney for Girard Street Investment
Holdings LLC and G&A Strategic
Investments*

Michael W. McDermott
Zachary J. Schnapp
BERGER MCDERMOTT LLP
1105 N. Market Street, 11th Floor
Wilmington, Delaware 19801
(302) 655-1140
mmcdermott@bergermcdermott.com
zschnapp@bergermcdermott.com
*Attorneys for Green Earth
Technologies, Inc.*

Ronald S. Gellert
GELLERT SEITZ BUSENKELL
    & BROWN, LLC
1201 North Orange Street
Suite 300
Wilmington, Delaware 19801
(302) 425-5800
rgellert@gsbblaw.com
*Attorney for Huntington Ingalls Inc.*

Arthur G. Connolly, III
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, Delaware 19801
(302) 757-7300
aconnolly@connollygallagher.com
*Attorney for Mobil Cerro Negro
Holding, LLC, Venezuela Holdings,
B.V., Mobil Cerro Negro, Ltd.*

Sarah T. Andrade
BAYARD, P.A.
600 N. King Street, Suite 400
P.O. Box 25130
Wilmington, Delaware 19801
(302) 655-5000
sandrade@bayardlaw.com
*Attorney for Pharo Gaia Fund, Ltd.,*
*Pharo Macro Fund, Ltd., and*
*Pharo Trading Fund, Ltd.*

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
  & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
rgmason@wlrk.com
arwolf@wlrk.com
mhcassel@wlrk.com
*Attorneys for Phillips Petroleum*
*Company Venezuela Limited,*
*ConocoPhillips Petrozuata B.V.,*
*ConocoPhillips Gulf of Paria B.V.,*
*and ConocoPhillips Hamaca B.V.*

Steven F. Molo
Justin M. Ellis
Lauren F. Dayton
Mark W. Kelley
Eric Rolston
Lauren Sexton
Adam Collins
Veronica Velasco
Peter Douglas
MOLOLAMKEN LLP
430 Park Avenue, 6th Floor
New York, New York 10022
(212) 607-8170
smolo@mololamken.com
jellis@mololamken.com
ldayton@mololamken.com
mkelley@mololamken.com
erolston@mololamken.com
lsexton@mololamken.com
acollins@mololamken.com
vvelasco@mololamken.com
pdouglas@mololamken.com
*Attorneys for Red Tree Investments,*
*LLC*

Margaret England
GELLERT SEITZ BUSENKELL
  & BROWN, LLC
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
(302) 425-5800
mengland@gsbblaw.com
*Attorney for Refineria*
*Di Korsou N.V.*

Christopher P. Simon
Michael L. Vild
CROSS & SIMON, LLC
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
(302) 777-4200
csimon@crosslaw.com
mvild@crosslaw.com
*Attorneys for Rosneft Trading S.A.*

R. Craig Martin
Angela Whitesell
Caleb G. Johnson
DLA PIPER, LLP (US)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801
(302) 468-5700
craig.martin@us.dlapiper.com
angela.whitesell@us.dlapiper.com
caleb.johnson@us.dlapiper.com
*Attorneys for Rusoro Mining Ltd.*

Brian M. Rostocki
John T. Miraglia
Justin M. Forcier
REED SMITH LLP
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500
brostocki@reedsmith.com
jmiraglia@reedsmith.com
jforcier@reedsmith.com
*Attorneys for Siemens Energy Inc.*
*and XYQ US, LLC*

Theodore A. Kittila
HALLORAN FARKAS +
    KITTILA LLP
5722 Kennett Pike, Suite C/D
Wilmington, Delaware 19807
(302) 257-2011
tk@hfk.law
*Attorney for Tenaris S.A.,*
*Talta-Trading e Marketing Sociedade*
*Unipessoal Lda., and Gramercy*
*Distressed Opportunity Fund LLC*

Andrew S. Dupre
Brian R. Lemon
AKERMAN LLP
222 Delaware Avenue
Suite 1710
Wilmington, Delaware 19801
(302) 596-9200
andrew.dupre@akerman.com
brian.lemon@akerman.com
*Attorneys for Tidewater Investment*
*SRL and Tidewater Caribe S.A.,*
*Valores Mundiales, S.L. and*
*Consorcio Andino, S.L.*

Alessandra Glorioso
DORSEY & WHITNEY LLP
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
(302) 425-7171
glorioso.alessandra@dorsey.com
*Attorney for U.S. Bank*
*National Association*

Michael W. Yurkewicz
KLEHR HARRISON HARVEY
  BRANZBURG LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
(302) 426-1189
myurkewicz@klehr.com
*Attorney for Vitol Inc.*

## BY EMAIL

GIBSON, DUNN & CRUTCHER
  LLP
Rahim Moloo
Robert L. Weigel
Jason W. Myatt
Zachary A. Kady
rmoloo@gibsondunn.com
rweigel@gibsondunn.com
jmyatt@gibsondunn.com
zkady@gibsondunn.com

RICHARDS, LAYTON & FINGER,
  P.A.
Raymond J. DiCamillo
Jeffrey L. Moyer
Travis S. Hunter
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff Crystallex International Corporation*

ABRAMS & BAYLISS LLP
A. Thompson Bayliss
Christopher Fitzpatrick Cannataro
Bryan Michael Blaylock
Stephen C. Childs
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com
blaylock@abramsbayliss.com
childs@abramsbayliss.com

MUNGER, TOLLES &
    OLSON LLP
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Seth Goldman
donald.verrilli@mto.com
elaine.goldenberg@mto.com
ginger.anders@mto.com
seth.goldman@mto.com

ARNOLD & PORTER KAYE
    SCHOLER LLP
Stephen K. Wirth
Kent A. Yalowitz
E. Whitney Debevoise, II
stephen.wirth@arnoldporter.com
kent.yalowitz@arnoldporter.com
whitney.debevoise@arnoldporter.com

YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
G. Mason Thomson
mthomson@ycst.com

*Attorneys for Defendant Bolivarian Republic of Venezuela*

POTTER ANDERSON &
    CORROON LLP
Myron T. Steele
Matthew F. Davis
Bindu A. Palapura
Malisa C. Dang
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com
*Attorneys for Special Master*
*Robert B. Pincus*

RILEY & JACOBSON, PLC
Joshua S. Bolian
Jared A. Hagler
jbolian@rjfirm.com
jhagler@rjfirm.com
*Attorneys for ACL1 Investments Ltd.,*
*ACL2 Investments Ltd., and LDO*
*(Cayman) XVIII Ltd.*

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Michael A. Barlow
Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
Morgan Rae Harrison
michaelbarlow@quinnemanuel.com
andrewrossman@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
matthewscheck@quinnemanuel.com
morganharrison@quinnemanuel.com

AKIN GUMP STRAUSS HAUER
  & FELD LLP
Richard J. D'Amato
Stephanie Lindemuth
Stephen M. Baldini
Z.W. Julius Chen
rdamato@akingump.com
slindemuth@akingump.com
sbaldini@akingump.com
chenj@akingump.com

CLEMENT & MURPHY, PLLC
Erin E. Murphy
H. Bartow Farr
erin.murphy@clementmurphy.com
bartow.farr@clementmurphy.com
*Attorneys for Amber Energy Inc.*

WINSTON & STRAWN LLP
M. Imad Khan
Rachael E. Thompson
Kelly A. Librera
ikhan@winston.com
rthompson@winston.com
klibrera@winston.com
*Attorneys for Banco San Juan*
*Internacional, Inc.*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Jeffrey J. Recher
Paul A. Paterson
Tyler B. Myers
jrecher@paulweiss.com
ppaterson@paulweiss.com
tmyers@paulweiss.com
*Attorneys for Blackrock Financial*
*Management, Inc. and Contrarian*
*Capital Management, L.L.C.*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Joseph O. Larkin
Robert D. Drain
joseph.larkin@skadden.com
robert.drain@skadden.com

STEPTOE LLP
Michael J. Baratz
Emma Marshak
Steven K. Davidson
mbaratz@steptoe.com
emarshak@steptoe.com
sdavidson@steptoe.com
*Attorneys for Girard Street*
*Investment Holdings LLC and*
*G&A Strategic Investments*

SAUL EWING LLP
Jennifer Becnel Guzzo
jennifer.becnel-guzzo@saul.com
*Attorney for Northrop Grumman*
*Ship Systems, Inc.; Saint-Gobain*
*Performance Plastics Europe; and*
*Koch Minerals Srl and Koch*
*Nitrogen International Srl*

MORGAN, LEWIS & BOCKIUS
  LLP
Christopher L. Carter
David K. Shim
christopher.carter@morganlewis.com
david.shim@morganlewis.com

SEQUOR LAW, P.A.
Edward H. Davis, Jr.
Fernando J. Menendez
edavis@sequorlaw.com
fmenendez@sequorlaw.com

*Attorneys for OI European Group B.V.*

ESBROOK P.C
Scott James Leonhardt
scott.leonhardt@esbrook.com
*Attorney for Ostrider Limited,*
*UML Blandford Limited,*
*Union Glory Limited and*
*Clion Limited*

WILLKIE FARR & GALLAGHER
  LLP
Samuel Hall
Michael Gottlieb
Noah Mussmon
Sam Huang
David J. L. Mortlock
shall@willkie.com
mgottlieb@willkie.com
nmussmon@willkie.com
shuang@willkie.com
dmortlock@willkie.com

MORRIS, NICHOLS, ARSHT
  & TUNNELL
Kenneth J. Nachbar
Susan W. Waesco
Alexandra M. Cumings
Phillip Reytan
Kirk Andersen
knachbar@mnat.com
swaesco@morrisnichols.com
acumings@morrisnichols.com
preytan@morrisnichols.com
kandersen@morrisnichols.com

*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation*

ROSS ARONSTAM & MORITZ
  LLP
Garrett B. Moritz
Elizabeth M. Taylor
gmoritz@ramllp.com
etaylor@ramllp.com

KOBRE & KIM LLP
Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com
*Attorneys for Phillips Petroleum
Company Venezuela Limited,
ConocoPhillips Petrozuata B.V.,
ConocoPhillips Gulf of Paria B.V.,
and ConocoPhillips Hamaca B.V.*

MOLOLAMKEN LLP
Joshua D. Bloom
Pratik K. Raj Ghosh
jbloom@mololamken.com
prajghosh@mololamken.com

LANDIS RATH & COBB LLP
Rebecca L. Butcher
Jennifer L. Cree
butcher@lrclaw.com
cree@lrclaw.com

SMITH, KATZENSTEIN, &
  JENKINS LLP
Jason Z. Miller
jm@skjlaw.com
*Attorneys for Red Tree Investments,
LLC*

CARTER LEDYARD &
  MILBURN LLP
Jeffrey S. Boxer
boxer@clm.com
*Attorneys for Refineria
Di Korsou N.V.*

DLA PIPER LLP (US)
James E. Berger
Charlene C. Sun
Alice Adu Gyamfi
Joshua S. Wan
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
alice.gyamfi@us.dlapiper.com
joshua.wan@dlapiper.com
*Attorneys for Rusoro Mining Ltd.*

REED SMITH LLP
Ambrose M. Bailey
Arturo Munoz Holguin
mbailey@reedsmith.com
amunoz@reedsmith.com

COLE SCHOTZ P.C.
Andrew L. Cole
Nathaniel J. Klepser
acole@coleschotz.com
nklepser@coleschotz.com
*Attorneys for Siemens Energy
Inc. and XYQ US, LLC*

DEBEVOISE & PLIMPTON LLP
Mark Friedman
William Taft
Carl Micarelli
Sarah Lee
Juan Fandino
Caroline H. Wallace
mwfriedman@debevoise.com
whtaft@debevoise.com
cmicarelli@debevoise.com
slee1@debevoise.com
jfandino@debevoise.com
chwallace@debevoise.com

HALLORAN FARKAS +
  KITTILA LLP
James Gordon McMillan, III
jm@hfk.law
*Attorneys for Tenaris S.A.,*
*Talta-Trading e Marketing Sociedade*
*Unipessoal Lda., and Gramercy*
*Distressed Opportunity Fund LLC*

COVINGTON & BURLING LLP
Miguel López Forastier
José E. Arvelo
Mark D. Herman
Amanda Tuninetti
mlopezforastier@cov.com
jarvelo@cov.com
mherman@cov.com
atuninetti@cov.com
*Attorneys for Tidewater Investment*
*SRL and Tidewater Caribe S.A.,*
*Valores Mundiales, S.L. and*
*Consorcio Andino, S.L.*

CLIFFORD CHANCE US LLP
Michelle M. McGreal
michelle.mcgreal@cliffordchance.com
*Attorney for U.S. Bank*
*National Association*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
  INTERNATIONAL LLP
Chad J. Husnick, P.C.
Jeffrey Michalik
Anna G. Rotman, P.C
Grant Jones
chad.husnick@kirkland.com
jeff.michalik@kirkland.com
anna.rotman@kirkland.com
grant.jones@kirkland.com
*Attorneys for Vitol Inc.*

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Petitioner*
*Gold Reserve Ltd.*

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, Aaron M. Panner, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: October 28, 2025

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Petitioner*
*Gold Reserve Ltd.*